698 A.2d 1287

JUAN A. COSME, PLAINTIFF–RESPONDENT, v. BOROUGH OF EAST NEWARK TOWNSHIP COMMITTEE, EAST NEWARK POLICE DEPARTMENT, AND KENNETH J. LINDSAY, DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued December 2, 1996—Decided September 5, 1997.

Before Judges HAVEY,[1] KESTIN and EICHEN.

*Stephen J. Edelstein* argued the cause for appellant (*Schwartz Simon Edelstein Celso & Kessler*, attorneys; *Mr. Edelstein*, of counsel and, with *Stephen G. Doherty* and *Marc H. Zitomer*, on the brief).

*Richard S. Robinson* argued the cause for respondents (*Anthony J. Fusco, Jr.*, attorney; *Mr. Fusco*, of counsel; *Mr. Robinson*, on the brief).

The opinion of the court was delivered by

---

[1] Judge Havey did not participate in the oral argument. The parties have, however, consented to his participation in the decision.

KESTIN, J.A.D.

Plaintiff, a member of the East Newark Police Department (Department), sought judicial review in the Law Division, pursuant to *N.J.S.A.* 40A:14–150, of his dismissal from his position as a police officer with the rank of patrolman. The Law Division judge, after a trial *de novo* on the record with additional testimony, adopted in full the findings which had been made by the departmental hearing officer. He also ruled, as the hearing officer had, that plaintiff should forfeit his pay for the period of an unauthorized absence. The trial judge determined, however, that the penalty of dismissal recommended by the hearing officer and effected by the Department was too harsh. He ordered, instead, a suspension for one year. Defendants' motion for reconsideration of that aspect of the penalty was denied and they appeal.

The Borough of East Newark (Borough) has not adopted the Civil Service Act, *N.J.S.A.* 11A:1–1 to:12–6. Consequently, discipline of police officers in that municipality is governed by *N.J.S.A.* 40A:14–147 to –151.

I

On March 17, 1995, defendant Chief of Police Kenneth Lindsay (Chief) filed departmental disciplinary charges against plaintiff alleging eight violations of the Borough's ordinances stemming from an unauthorized absence from duty. The charges were:

- willful disobedience of orders;
- absence without leave;
- incompetency;
- neglect of duty;
- conduct subversive of the good order and discipline of the Police Department;
- failure to promptly obey rules, regulations, instructions and orders;
- failure to devote time and energy to police business by putting private interests ahead of police duties;
- failure to perform such tours of duty as may be prescribed by the Chief of Police.

The "recommended penalty" was dismissal from the Department and forfeiture of pay for the days of plaintiff's absence: March 10,

11, 12, 15, 16, 17 and 18, 1995. The charges contained a notice of immediate suspension from duty without pay. Notice of a hearing date was also included, as required by statute. *N.J.S.A.* 40A:14–147.

The evidence at the hearing was consistent with the charged specifications. Plaintiff had been a member of the Department since 1985. It was a small police force comprised of six officers: the chief, two captains, and three patrolmen including plaintiff. On January 16, 1995, plaintiff submitted a written request for seven vacation days: March 10, 11, 12, 15, 16, 17, and 18. The request was approved on January 17.

The applicable collective negotiations agreement left the scheduling of vacations to the employer. Accordingly, plaintiff's request was on a standard form which contained the following language: "I fully understand that all vacation requests are subject to approval and meets a proper scheduling of manpower, so the protection of our community remains our prime concern [sic]."

On January 18, plaintiff was injured while on duty and was out on medical leave for six weeks. Upon plaintiff's return on March 6, Chief Lindsay informed him that his vacation had been cancelled because of personnel considerations. Plaintiff's medical leave and the overlapping medical leave of another officer had required the remaining members of the department to schedule excessive overtime. In order to regularize the situation, both officers' previously approved vacations, as well as the Chief's own planned vacation, were cancelled.

Plaintiff had prepaid for a seven- or eight-day vacation in Cancun, Mexico. He objected to the cancellation and threatened both to file a grievance and to litigate the matter. Without rescinding the cancellation order, the Chief told plaintiff that he would discuss the issue and plaintiff's reaction with the Borough's Police Committee at its meeting on March 8, and would inform plaintiff of the Committee's action during his scheduled day shift on March 9. At the March 8 meeting, the Police Committee supported the Chief's decision.

Plaintiff did not report for duty on March 9 and made no effort to communicate with the Chief to learn of the Committee's decision. Chief Lindsay made a number of attempts to communicate with plaintiff, all of which were unavailing because plaintiff could not be found.

At about 2:00 a.m. on March 9, plaintiff had called in to say that he was ill and would be unable to report for duty at 6:00 a.m., the time he was scheduled to begin his shift. When Chief Lindsay arrived at Department headquarters that morning, he was advised of plaintiff's call. He sent an officer to plaintiff's home twice within the ensuing four-hour period to advise plaintiff that the decision concerning cancellation of vacations remained unchanged. Plaintiff was not home, and no one answered telephone calls made to his home. The efforts of other officers to communicate with or locate plaintiff later that day and on subsequent days were also unsuccessful.

Plaintiff could not be reached because he was in his parents' home, a dwelling attached to his own by a common garage. At the departmental hearing, plaintiff testified that after calling in sick at about 2:00 a.m. on March 9, he went back to sleep and called his mother after he awoke at seven or eight o'clock to tell her that he was ill. He went to his parents' home, ate breakfast and went back to sleep there. Plaintiff's mother left for work at 2:00 p.m., and his sister-in-law drove him to the family doctor late in the afternoon. Although no physician's statement was required to verify his illness, plaintiff acquired a note handwritten on a prescription form: "The ... patient was seen by me on 3/9/95 due to strep throat and was told to do bed rest for at least 10 days ... taking the medication prescribed."

Plaintiff went on to testify that he did not "call work and book off sick for the 10 days pursuant to the doctor's note." He explained the circumstances surrounding his decision to leave on vacation:

A. Because I had too much money on the trip, I decided just to go.
Q. You already had—you were already on vacation?

A. Yeah, I was on vacation; I'm not going to call out sick.

Q. So you didn't need to call out sick, you were already on vacation?

A. I was on vacation, I didn't need to.

\* \* \* \* \* \* \* \*

Q. [A]t any time prior to you going on vacation did you return home other than to get luggage and leave?

A. I never returned home, but my father did.

\* \* \* \* \* \* \* \*

[He] picked up my luggage, put it in the car, and picked me up in front of his house.

Q. How did you get to the airport?

A. My father took me there.

Q. And what day did you leave for your trip, when were your tickets for?

A. That was March 10, six in the morning.

On cross-examination, plaintiff testified that he went on his trip to Cancun despite being ill because "[i]t was paid in advance," and "I . . . rested down there." Further cross-examination produced the following exchange:

Q. Where did you sleep on the night of March 9?

A. My parents' home.

Q. How far is that from your home?

A. Directly behind me.

Q. Why didn't you sleep at your own home?

A. 'Cause I was sick, and I stayed there. I wanted to get as much rest as possible so I could be ready to go to vacation.

Q. So you thought you'd get more rest at your parents' home than at your own home?

A. Yes. Plus my mother cooks for me there. I don't cook, so I always eat at my mother's house.

Q. Why did you think you could get more rest at your mother's home than your own home?

A. I don't have to get up from bed constantly to get things.

Q. It wouldn't be that you wanted to avoid anybody that came to see you or talk to you at the time, was it?

A. No.

Q. Now, at any time on March 8[sic] did you call the chief and say, "So what happened at the police committee meeting?"

A. As far as everything's concerned, the chief was supposed to get back to me and there was no meet [sic]. \* \* \* No, I did not.

Plaintiff returned from Cancun late at night on March 18. The charges filed by Chief Lindsay on March 17 contained the following specification:

On March 9, 1995, the day before the first day of his anticipated vacation, Officer Cosme called in sick. He has failed to report to duty since that date. Despite numerous efforts by the Department to contact him, Officer Cosme's whereabouts remain unknown.

### The hearing officer made the following findings:

Chief Lindsay did in fact tell Officer Cosme that his vacation was cancelled. Chief Lindsay made every attempt through his Police Department Officers to contact Officer Cosme during the period of time from March 9th through 17th. Chief Lindsay did not, at any time, tell Officer Cosme that his vacation might be cancelled but did, however, indicate that he would seek to appeal his decision of cancelling Officer Cosme's vacation to the Borough Counsel's Police Committee which subsequently sustained Chief Lindsay's directive. The hearing officer further concludes that Chief Lindsay was truthful, honest and straightforward in his testimony. Captain Padavano, Sgt. Baggett and Officer Schimenti were also very candid, truthful and their testimony is considered to be credible.

The testimony of Officer Schimenti is key in that he testified he was aware that there was a phone answering machine and realized it was not working or had been shut off, therefore he could not leave a message and went to the home of Officer Cosme and did not receive any response upon knocking upon the front door and ringing the bell.

Officer Cosme testified that he became ill on March 8th [sic], that he contacted Harrison Police Department at approximately 2:00 a.m. to relay a message to his Police Department at 6:00 a.m. he would not be in for his detail. He further testified that he went to his mother's home that morning, had his breakfast and stayed there until he went to the Doctor at 4:00 that afternoon. Officer Cosme presented a doctor's note which indicated that Officer was suffering from a condition known as "strep throat". The doctor's note clearly indicated that he should have bed rest for at least ten (10) days. Officer Cosme testified that at no time, from the moment he went to his mother's house until he left for his vacation, did he return to his home (which is adjacent to his mother's home, in a mother-daughter type of home).

Officer Cosme's father retrieved his belongings from Officer Cosme's home and then drove the Officer to the airport at approximately 4:00 a.m., the morning of the 10th of March, 1995. Cosme also testified that he went to Cancun, Mexico and participated in Spring break with a couple of buddies. He testified he was not sure whether his vacation was cancelled or not and that even though he was ill, he thought bed rest in Cancun, Mexico during Spring break was the same as bed rest at his mother's house and being cared for by her.

Officer Cosme then testified that it was a "good time in Mexico." He testified he was shocked when he came back and received the notice for which this matter is being heard. It should be noted that Officer Cosme lives in the Borough of East

Newark and did not attempt to contact any person working in the Borough of East Newark Police Department to determine whether or not the question of his vacation had been settled. He further testified there wasn't any member of his family attempting to contact the Borough of East Newark Police Department, nor was there any testimony that Officer Cosme did anything other than what he says he did, which was to go to Cancun for his vacation. (Officer Cosme testified that he didn't believe it was wrong he should not participate in his vacation [sic] since he already had paid for it.)

The hearing officer finds the testimony of Officer Cosme incredible. This police officer clearly decided that he was going on his vacation, would not be on duty the week of March 10–17th and that his paid for vacation was more important than the protection of the Borough of East Newark. This officer clearly decided that his personal interests far exceeded those of the duties and responsibilities of his job. After careful review and careful reading of the closing statements, this hearing officer finds, as fact, that Officer Cosme lied and was less than credible and that Chief Lindsay was truthful and credible. Officer Cosme purposely put himself in a position as to not being able to participate in his job as a police officer of the Borough of East Newark and put the Town's people at risk. Officer Cosme clearly chose himself over his duty, honor and responsibility.

Therefore, Officer Cosme's refusal to obey orders not only demonstrated a lack of concern for the citizens of East Newark, but also created a potential threat for the morale, efficiency and discipline of the East Newark Police force. Such conduct cannot be tolerated. [*City of Newark v. Massey*, 93 *N.J.Super.* 317, 323, 225 A.2d 723 (App.Div.1967)]. Further, [he] plainly demonstrated a lack of the integrity and dependability required of a police officer.

[*Township of Moorestown v. Armstrong*, 89 *N.J.Super.* 560, 566, 215 A.2d 775 (App.Div.1965)].

Based upon the foregoing findings, the hearing officer sustained all eight charges against plaintiff and determined that the seriousness of the infractions warranted a dismissal from the police force, effective immediately. The hearing officer also recommended that plaintiff should be required to forfeit his pay for the period of his unauthorized absence, and should repay the Borough of East Newark that amount.

Pursuant to *N.J.S.A.* 40A:14–150, which expressly authorizes "supplement[ation of] the record with additional testimony subject to the rules of evidence[,]" the trial court's *de novo* on the record review was augmented by additional testimony from plaintiff, as well as that of numerous police officer witnesses from East Newark and other communities attesting to his good character and trustworthiness as a police officer. Cross-examination re-

vealed that plaintiff had been the object of other prior disciplinary proceedings. With regard to the instant matter, the record of the trial court proceedings contains the following exchange on plaintiff's direct examination:

Q. Mr. Cosme, just in summing up, was it ever your impression that you were given a direct order definitively that you[r] vacation time was cancelled?

A. No, it was never given to me.

Q. Would you have gone on vacation if you were given a direct order?

A. If I was given a direct order I would of never of went on vacation.

Q. Have you ever disobeyed a direct order before?

A. No, I haven't.

Based upon the entire record the trial judge made findings which were set out in his letter opinion of March 25, 1996:

The court has reviewed the record and findings of the hearing officer, Robert Rosenberg. The court finds no reason to challenge his findings as to the facts he determined and as to the credibility of the witnesses, particularly the plaintiff, Juan Cosme. The record amply supports the finding that Patrolman Cosme knew his vacation was cancelled or at the very least knew his vacation was subject to being cancelled. He clearly put himself out of the Chief's reach in the days and hours before taking off for Cancun. His conduct clearly merited disciplinary action.

The supplementary testimony offered by the plaintiff at the hearing before this court consisted primarily of witnesses attesting to the character of Juan Cosme and his abilities as a police officer of some 10 years. In addition, there was testimony concerning "bad blood" or ill feelings between Officer Cosme and Chief Keating [sic] because of past problems, most particularly arising out of allegations that Officer Cosme had made concerning the Chief's involvement in the dismissal of traffic tickets back in 1990.

While the court is sure that there is no love lost between Cosme and Chief Keating [sic], the court does not find that the Chief was retaliating against Cosme by cancelling his vacation. It may be, however, that the past differences between the two may have motivated the Chief to seek the ultimate penalty of dismissal against the plaintiff to which the hearing officer agreed.

The trial judge then determined that "the penalty assessed was too harsh," and set out his reasons for that view:

The supplemental testimony offered was extensive and credible. Many witnesses testified as to plaintiff's abilities as a police officer and his contributions to the community in general. Police officers from other towns testified as to his abilities and spirit of cooperation.

Plaintiff Cosme's record and past contributions to the department and the community do not appear to have been considered below. It is clear that this court, in conducting a *de novo* review, can review the penalty and impose a different one if warranted. As the Supreme Court of N.J. said in *In re Phillips,*

117 *N.J.* 567 at p. 581 [569 *A.*2d 807], "although we recognize that a tribunal may not consider an employee's past record to prove a present charge, [*Town of*] *West New York v. Bock,* 38 *N.J.* 500, 523 [186 *A.*2d 97] (1962), that past record may be considered when determining the appropriate penalty for the current offense. *In re Wenderwicz,* 195 *N.J.Super.* 126, 131–32 [478 *A.*2d 428] (App.Div.1984)."

There is no doubt that plaintiff Cosme's offense was a serious one. Punishment is in order. The court does not believe that the punishment in this case should include the loss to plaintiff of the opportunity to continue his chosen career or the loss to the community of an otherwise well qualified police officer.

The trial judge ordered "a penalty of suspension for one year and loss of pay for the period of his unauthorized absence."

## II

It is beyond question that the trial court's authority in reviewing the matter *de novo* on the record was plenary. The statute, by empowering the trial court to "affirm, reverse or modify" the decision reached on the municipal level, *N.J.S.A.* 40A:14–150, not only contemplates independent findings of fact and conclusions, but also expressly addresses the scope of the court's authority where a dismissal has been ordered on the local level.

If the applicant shall have been removed from his office, employment or position the court may direct that he be restored to such office, employment or position and to all his rights pertaining thereto, and may make such other order or judgment as said court shall deem proper.

[*Ibid.*]

The *N.J.S.A.* 40A:14–150 trial court's power to modify the sanction has consistently been regarded as self-evident, *see, e.g., In re Disciplinary Procedures of Phillips,* 117 *N.J.* 567, 578–81, 569 *A.*2d 807 (1990); *Grasso v. Borough Council of Glassboro,* 205 *N.J.Super.* 18, 25, 500 *A.*2d 10 (App.Div.1985), *certif. denied,* 103 *N.J.* 453, 511 *A.*2d 639 (1986), with only one limitation thus far declared: that the penalty imposed on the municipal level may not be increased or enhanced on judicial review.[2] *In re Disciplinary*

---

[2] This limitation has a non-congruent counterpart in the Civil Service Act. *N.J.S.A.* 11A:2–19 provides: "The [Merit System B]oard may increase or decrease the penalty imposed by the appointing authority, but removal shall not be substituted for a lesser penalty."

*Hearing of Bruni*, 166 *N.J.Super.* 284, 291, 399 *A.2d* 997 (App.Div. 1979).

▮▮▮ Notwithstanding the scope of its authority, the trial court is not a free agent in this regard, however. While the determination of the sanction to be applied where a dereliction of duty has been found is, to a great extent, a discretionary exercise, judicial discretion is not unguided or uncontrolled.

> Judicial discretion, sound discretion guided by law so as to accomplish substantial justice and equity, is a magisterial, not a personal discretion. It is legal discretion, in which the judge must take account of the applicable law and be governed accordingly. If the judge misconceives or misapplies the law, his discretion lacks a foundation and becomes an arbitrary act. When that occurs, the reviewing court should adjudicate the matter in light of the applicable law to avoid a manifest denial of justice.
>
> [*In re Presentment of Bergen County Grand Jury*, 193 *N.J.Super.* 2, 9, 471 *A.2d* 1203 (App.Div.1984) (citations omitted).]

There are, to be sure, at least two distinct categories of judicial discretion. The first involves the latitude to reach a dispositional result based upon facts found from the evidence. *Id.* at 9–12, 471 *A.2d* 1203. The second is associated with the court's authority to manage the conduct of cases and to make rulings, even those with substantive effect, that stem from procedural considerations or reflect the manner in which the parties have litigated the case. *See Smith v. Smith*, 17 *N.J.Super.* 128, 131–33, 85 *A.2d* 523 (App.Div.1951), *certif. denied*, 9 *N.J.* 178, 87 *A.2d* 387 (1952).

▮▮▮ With respect to the latter category, we are enjoined to accord substantial deference to such rulings of trial judges and not to "invalidate such determinations merely because from our examination of the record we believe that we would have decided differently." *Id.* at 134, 85 *A.2d* 523. Even with regard to the former, just as we are obliged to consider "[f]indings [of fact to be] binding on appeal when supported by adequate, substantial and credible evidence," *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974), we are charged to accord substantial regard to the conclusions of trial judges and to discretionary determinations that flow from them. *Gillman v. Bally Mfg. Corp.*, 286 *N.J.Super.* 523, 528, 670 *A.2d* 19 (App.Div.), *certif.*

*denied*, 144 *N.J.* 174, 675 *A.*2d 1122 (1996); *cf. Lautek Corp. v. Image Bus. Sys. Corp.*, 276 *N.J.Super.* 531, 541, 648 *A.*2d 488 (App.Div.1994). Mandates of deference do not apply when issues of law are involved, however. *In re J.W.D.*, 149 *N.J.* 108, 117, 693 *A.*2d 92 (1997); *Manalapan Realty v. Township Comm.*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.")

Although the statute governing judicial review of disciplinary proceedings against police employees in non-civil-service municipalities, *N.J.S.A.* 40A:14–150, is couched in terms that confer decisional discretion upon the trial judge, that discretion, too, must be exercised in conformity with applicable rules of law grounded either on clear statutory declarations or upon the types of policy considerations that inform case law standards which are not based on explicit statutory criteria. The determination whether or not a trial judge has pronounced judgment agreeably with the applicable rule of law is, in this connection, as in all others, one to be made independently by an appellate court, unfettered by principles of decisional deference. *In re J.W.D., supra*, 149 *N.J.* at 117, 693 *A.*2d 92; *Manalapan Realty, supra*, 140 *N.J.* at 378, 658 *A.*2d 1230.

## III

We are called upon to determine not only whether the trial judge's discretion to modify the penalty imposed on the municipal level was a fair and equitable result that flowed logically from the record before him, but also whether, as a matter of law, the particular result reached was one that is or ought to be available in the circumstances. After examining all the available arguments and authority so ably provided by counsel for the parties and discovered independently, we conclude that in ordering a one-year suspension from plaintiff's employment, the trial judge applied a mistaken view of the law.

The broad question is whether, as a matter of law, there are any limitations on the discretion of the decision maker in a police disciplinary proceeding regarding the penalty to be imposed where a major breach of conduct has been established. The answer has been provided by the Legislature, the Supreme Court and the Merit System Board for proceedings arising under the Civil Service Act. With a single exception of no consequence here, the current statutory provision states:

[A]n appointing authority may not impose a suspension or fine greater than six months.

[*N.J.S.A.* 11A:2–20 (last sentence).]

In explicating a like provision of the predecessor statute the Supreme Court noted:

[T]he pertinent language can be given no other construction but its plain meaning that if suspension is the form of penalty determined as appropriate, the duration thereof cannot extend beyond 6 months.... [F]urther[,] ... the limitation is mandatory rather than directory, since it involves substantive rights of the employee and not merely procedural details.

 * * * * * * * *

We are ... unable to find any basis whatever to sustain the town's suggested interpretation that the limitation merely proscribes the Commission from increasing a suspension penalty of less than 6 months imposed at the local level to one longer than that period of time. It follows of course from the view we have expressed that the statutory limitation on the Commission's power necessarily limits the appointing authority in meting out suspension as a punishment to the same extent.

There is in our mind a sound reason for the limitation. To us it represents a legislative policy decision that if an employee's offense, coupled with his admissible past record, is serious enough to dictate a suspension from duty for more than 6 months, it merits dismissal instead. Long periods of suspension require other regular or temporary employees to perform the duties of the suspended man while his position must be kept open for his return. Such a situation is obviously not in the public interest.

[*Town of West New York v. Bock,* 38 *N.J.* 500, 525–26, 186 *A.2d* 97 (1962).]

The Merit System Board has codified the limitation and the underlying policy in pervasive language:

No suspension or fine shall exceed six months....

[*N.J.A.C.* 4A:2–2.4(a).]

No such direct and unambiguous statement of law exists in this regard with relation to proceedings in municipalities not regulated by the Civil Service Act. The Title 40A provisions governing police discipline contain no counterpart to the last sentence of *N.J.S.A.* 11A:2–20. Generally pertinent discussions can be found in various cases, but no court has yet addressed the question directly; and there is no statewide agency vested with the authority to promulgate regulations governing such proceedings. Yet, a Superior Court judge, sitting as a tribunal of review, cannot be seen to be a free agent in this or any other regard, unconfined by standards and limitations, for if such were the case the discretion reposed by law would "lack[ ] a foundation and become[ ] an arbitrary act." *In re Presentment of Bergen Cty. Grand Jury, supra,* 193 *N.J.Super.* at 9, 471 *A.*2d 1203.

### IV

■ Even within the context of non-civil-service municipalities, we are mindful of the general policy rationale articulated by the Supreme Court:

> [I]f an employee's offense, coupled with his admissible past record, is serious enough to dictate a suspension from duty for more than 6 months, it merits dismissal instead. Long periods of suspension require other regular or temporary employees to perform the duties of the suspended man while his position must be kept open for his return. Such a situation is obviously not in the public interest.
>
> [*Town of West New York v. Bock, supra,* 38 *N.J.* at 526, 186 *A.*2d 97.]

We can see no basis for divining, in this connection, a different decisional standard for non-civil-service municipalities than applies to those which have elected to be governed by the Civil Service Act. *See In re Disciplinary Hearing of Bruni, supra,* 166 *N.J.Super.* at 289–91, 399 *A.*2d 997. The problems engendered by overly long suspensions are the same for every type of municipality. Those problems are especially grave in the smaller municipalities.

■ Furthermore, we have, in the past, reflected on how disrespect for superiors, disregard of established performance standards, and perverse use of regular procedures subverts the good order and discipline that is essential to a properly run police

department. Such acts constitute conduct so unbecoming a police officer as to warrant dismissal. *City of Newark v. Massey*, 93 *N.J.Super.* 317, 322–23, 225 *A.*2d 723 (App.Div.1967).

> It must be recognized that a police officer is a special kind of public employee. His primary duty is to enforce and uphold the law. * * * He represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public, particularly in a small community....
>
> [*Township of Moorestown v. Armstrong*, 89 *N.J.Super.* 560, 566, 215 *A.*2d 775 (App.Div.1965), *certif. denied*, 47 *N.J.* 80, 219 *A.*2d 417 (1966).]

Having applied these perceptions in *City of Newark v. Massey* and in *Township of Moorestown v. Armstrong* to reverse a state administrative agency's reduction of penalty from dismissal to six months' suspension—a context in which the scope of our review is limited by separation of powers considerations—we are no less constrained to do so in a case such as the instant matter in which we are called upon to articulate and apply a decisional standard for judges to follow, especially in the face of the general policy rationale articulated by the Supreme Court in *Town of West New York v. Bock, supra*, 38 *N.J.* at 526, 186 *A.*2d 97.

Such a limitation upon the decision maker's discretion in selecting the appropriate sanction is especially fitting in a case such as this, where the findings of the trial judge, both in his own evaluation and in his adoption of the hearing officer's assessments, were not only that plaintiff demonstrated a lack of the personal integrity and regard for the community's welfare that is essential in a police officer, but also that he wholly lacked credibility as a witness. More specifically, with a sustainment of eight charges of basic misconduct that included willful disobedience of orders, neglect of duty, and placing personal interests ahead of police duties in the circumstances established, the infractions charged and established go to the heart of plaintiff's capacity to function appropriately as an officer in the East Newark Police Department. *See Henry v. Rahway State Prison*, 81 *N.J.* 571, 580, 410 *A.*2d 686 (1980).

All the findings are well supported by the record. *In re Disciplinary Procedures of Phillips, supra*, 117 *N.J.* at 579, 569

A.2d 807; *Rova Farms Resort, Inc. v. Investors Ins. Co., supra,* 65 *N.J.* at 484, 323 *A.*2d 495. We conclude that the trial judge was well warranted in evaluating the circumstances here as amounting to a major breach of conduct and discipline calling for a punishment well in excess of a six-month suspension. We hold that that determination, as a matter of law, requires a sanction of dismissal.

V

The order of the trial court imposing a suspension of plaintiff for one year is reversed and is hereby modified to direct plaintiff's dismissal from the East Newark Police Department. In all other respects the trial court's order and the findings and conclusions upon which it is based are affirmed.