**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0913-21

JUSTIN CHERRY,

    Plaintiff-Appellant,

v.

TUCKERTON BOROUGH
POLICE DEPARTMENT,

    Defendant-Respondent.

_____

Submitted November 10, 2022 – Decided November 13, 2023

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-1072-20.

Law Offices of Riley & Riley, attorneys for appellant (Tracy L. Riley, on the brief).

Levin Shea Pfeffer & Goldman, PA, attorneys for respondent (Ian M. Goldman, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Plaintiff Justin Cherry appeals from the October 25, 2021 judgment of the Law Division affirming his termination as a sworn law enforcement officer with defendant Tuckerton Borough Police Department (TPD). We affirm in part and reverse in part.

I.

The following facts were found by the trial court. Cherry began his employment as a TPD police officer in 2005. In January 2009, Cherry assumed responsibility as the K-9 officer for the department and purchased a dog named Gunner. He had previously been suspended for insubordination.

At about 9:19 p.m. on January 29, 2014, Cherry, while on duty with Gunner, responded to a domestic dispute together with Corporal John Sanzari. The officers encountered L.H. who advised them that W.T., his fifty-eight-year-old former girlfriend, was visiting his apartment, but refused to leave when asked.[1] The officers mediated the dispute and convinced W.T. to leave the apartment. She intended to return to her home in Barnegat Township.

During the encounter, L.H. informed the officers that W.T.'s driver's license had been revoked. Sanzari checked W.T.'s driving record and confirmed

---

[1] We identify the persons involved in the domestic dispute by their initials to protect their confidentiality. R. 1:38-3(a)(12).

that she was on the revoked list. The officers advised W.T. that she could not operate her vehicle and had to find another method of transportation home. W.T. appeared to follow their instructions and headed toward a bus stop at the entrance to the apartment complex.

At 9:31 p.m., the officers cleared from the domestic dispute. While Sanzari returned to road patrol, Cherry remained in the area, suspecting W.T. would return to her vehicle and drive home once she thought the officers were gone. At 9:45 p.m., W.T. returned to her vehicle and drove it north on Route 9 toward Barnegat.

Cherry followed W.T.'s vehicle in his patrol car. He pulled up behind W.T. and activated his emergency lights and siren. His intent was to issue W.T. a summons for a motor vehicle infraction pursuant to N.J.S.A. 39:3-40, driving while on the revoked list. A motor vehicle violation of this type would not normally justify a vehicle pursuit under TPD policy.

W.T. did not pull over and continued northbound on Route 9. She made a sharp left onto Cable Avenue without signaling. W.T. then proceeded on Cable Avenue into Little Egg Harbor Township, where she made an abrupt right onto Railroad Avenue without stopping at a stop sign, and headed north. Cherry was pursuing W.T. with his emergency lights and siren activated.

3

At 9:47 p.m., Cherry transmitted over the police radio that W.T. "blew" the stop sign at Railroad Avenue and Parkertown Drive in Little Egg Harbor. In response, Sanzari, who was road supervisor that evening, transmitted over the radio, "Justin, we know it's her. I mean, I would just let her go. We'll just mail it to her if we have to." Cherry responded, "[w]ell now I got eluding too." At around 9:49 p.m., Cherry reported that he terminated the pursuit for safety reasons. He deactivated the emergency lights and siren on his patrol vehicle but continued to pursue W.T. at what he reported to be a safe distance.

Cherry followed W.T. back to Route 9, where she turned northbound. Cherry reported that at 9:50 p.m. he was "totally off her" and was slowly following behind W.T.'s vehicle. Cherry followed W.T. through Eagleswood Township and into Stafford Township.

At 9:53 p.m., Stafford Township police, who had been alerted to the pursuit, asked if they should lay down spike strips to disable W.T.'s vehicle. Sanzari refused to approve the use of spike strips, telling Cherry, "She's going home. I would wait 'til she gets home and have Barnegat pick her up." Cherry advised Sanzari that he was following W.T. at a safe speed. A Stafford officer also tried unsuccessfully to stop W.T.

At 9:59 p.m., Cherry reported that W.T. turned left onto West Bay Avenue in Barnegat Township and immediately thereafter pulled into the parking lot of the Barnegat Township police station. Two Barnegat Township police officers who arrived almost immediately effectuated a stop of W.T. in the parking lot.

W.T. initially resisted arrest by the two Barnegat Township officers, but was eventually removed from her vehicle and placed face down on the ground. A video recording confirmed that W.T.'s hands were in view and not underneath her body. The Barnegat officers did not request Cherry's assistance or motion to him to use Gunner to apprehend W.T. Without giving a warning and opportunity to stop resisting, as required when possible, by TPD's canine policy, Cherry released Gunner on W.T. while she was on the ground. Gunner bit at W.T.'s arm and back, although the dog did not cause physical injuries.

For approximately twenty-eight seconds, Cherry stood by and did not call the dog off W.T., although she was no longer resisting the officers. Cherry called off Gunner only after a Barnegat Township officer said, "enough with the dog." Contrary to TPD policy, Cherry did not take photographs of W.T. after Gunner was removed from her.

Cherry contacted an assistant prosecutor, who advised him to charge W.T. with third-degree eluding and resisting arrest, N.J.S.A. 2C:29-2(a)(3).

Cherry subsequently filed police reports stating that he terminated his pursuit of W.T. while in Little Egg Harbor Township, approximately 1.9 miles from where he first attempted to stop her in Tuckerton. He reported that he did not exceed the posted speed limit while pursuing W.T. In addition, Cherry reported that when he released Gunner at the Barnegat police station W.T. posed an immediate threat to the safety of the officers because she was resisting arrest and it was unknown if she had a weapon.[2]

After an internal affairs investigation was opened by TPD, Cherry was suspended with pay by order of the Ocean County Prosecutor's Office (OCPO), which undertook its own investigation of the incident. Ultimately, Cherry was suspended without pay after he was indicted by a grand jury on several criminal counts. Ultimately, a superseding indictment charged Cherry with second-degree official misconduct, N.J.S.A. 2C:30-2, for using Gunner to commit simple assault on W.T. In May 2019, after a bench trial, the court acquitted Cherry of the criminal charge.

During the five years that the criminal charge was pending, TPD took no action with respect to departmental discipline against Cherry for the events of

---

[2] W.T. subsequently pled guilty to third-degree eluding and resisting arrest, N.J.S.A. 2C:29-2(b).

A-0913-21

January 29, 2014. After resolution of the criminal charge, the Chief of the TPD personally conducted a disciplinary investigation. As part of his investigation, the Chief reviewed the investigative files of the OCPO.

On June 28, 2019, TPD served Cherry with a Preliminary Notice of Disciplinary Action setting forth fifteen charges:

> Charge 1: Violation of Tuckerton Borough's Vehicle Pursuit Policy . . . II. Policy: It shall be the policy of the [TPD] to limit vehicular pursuits by officers and to evaluate their decision to initiate a pursuit, or continue or terminate a pursuit based upon the risk posed to the public, the occupant(s) of the suspect vehicle and the police officer(s). When the risk of (sic) human life and/or property outweighs the benefits of capture, officers should refrain and/or disengage from pursuits. The threat of injury, death and property damages is borne by innocent bystanders, the peace officer involved in the pursuit, the fleeing driver and the occupant(s) of the escaping vehicle.
>
> Charge 2: Violation of Tuckerton Borough's Vehicle Pursuit Policy . . . VI.A.4.a: an officer will immediately disengage any attempt to stop a violator for a motor vehicle violation. It further states that no officer shall make additional attempts to stop or reengage the vehicle while in motion, based on the original reason for the attempt to stop.
>
> Charge 3: Violation of Tuckerton Borough's Vehicle Pursuit Policy . . . VI.A.3.d: Officers shall immediately terminate a pursuit when the pursuit enters into another jurisdiction and exceeds one mile into the neighboring jurisdiction.

7

Charge 4: Violation of Tuckerton Borough's Vehicle Pursuit Policy . . . <u>IX.A.3</u>: Pursuing officer(s) will terminate pursuit when the violator is identified and failure to apprehend poses no immediate threat of death or serious bodily injury to another person.

Charge 5: Violation of Tuckerton Borough's Vehicle Pursuit Policy . . . <u>VIII.A.4</u>: No pursuit shall be conducted where the violator is known and poses no immediate continuing threat to the safety of the public.

Charge 6: Violation of Tuckerton Borough's Vehicle Pursuit Policy . . . <u>IX.A.9</u>: Cherry continued to follow the suspect vehicle after he was advised to disengage by the [Officer In Charge].

Charge 7: Violation of Tuckerton Borough's Canine Policy and Procedures . . . <u>III.C.3</u>: It is imperative that the handler fully understands that they may only use that amount of force necessary to effectuate a lawful arrest. Therefore the deployment of the police canine to effectuate lawful arrests should only be considered when the use of force would be justified in effectuating the arrest.

Charge 8: Violation of Tuckerton Borough's Canine Policy and Procedures . . . <u>III.D.4.c</u>: Whenever possible, the handler shall afford the suspect(s) the opportunity to surrender by giving the following warning announcement prior to releasing the K-9 for an apprehension. "Police, you are under arrest. Stop or I will release my dog."

Charge 9: Violation of Tuckerton Borough's Canine Policy and Procedures . . . <u>III.D.4.f</u>: The handler will <u>immediately</u> advise the suspect to stop fighting and/or resisting the K-9, and the handler will command the K-9 to release.

8

Charge 10: Violation of Tuckerton Borough's Canine Policy and Procedures . . . III.D.4.g: Once the suspect has complied and submits to the arrest, the handler will immediately command the K-9 to release the apprehension and call the K-9 into a watch position.

Charge 11: Violation of Tuckerton Borough's Canine Policy and Procedures . . . . Complete documentation, including photographs and explanation of the circumstances surrounding the physical apprehension.

Charge 12: Violation of Tuckerton Borough's Rules and Regulations . . . 3:5.7 Truthfulness: Employees shall not knowingly lie, give misleading information, or falsify oral or written communications in any official report when it is reasonable to expect that the information may be relied upon because of the employee's affiliation with this department.

Charge 13: Violation of Tuckerton Borough's Rules and Regulations . . . 3:5.7 Truthfulness: Employees shall not knowingly lie, give misleading information, or falsify oral or written communications in any official report when it is reasonable to expect that the information may be relied upon because of the employee's affiliation with this department.

Charge 14: Violation of Tuckerton Borough's Rules and Regulations . . . 3:5.7 Truthfulness: Employees shall not knowingly lie, give misleading information, or falsify oral or written communications in any official report when it is reasonable to expect that the information may be relied upon because of the employee's affiliation with this department.

Charge 15: Violation of Tuckerton Borough's Rules and Regulations . . . 3:5.7 Truthfulness: Employees

A-0913-21

shall not knowingly lie, give misleading information, or falsify oral or written communications in any official report when it is reasonable to expect that the information may be relied upon because of the employee's affiliation with this department.

Cherry pled not guilty to the disciplinary charges. An independent hearing officer held a hearing over ten days, at which various participants in the events of January 29, 2014, testified, as did a traffic accident reconstruction expert, trained on the Attorney General's vehicular pursuit guidelines. The expert examined radio transmissions, the report created by the dispatching agency of the times those transmissions were made, with accompanying notes, the records of the officers involved, and traveled the route taken by Cherry as he pursued W.T. The expert opined that Cherry had to have pursued W.T. at speeds greatly in excess of those he reported in order to have traveled between the locations he stated in his radio transmissions, given the times that those transmissions took place. The expert opined that Cherry was averaging seventy-six miles per hour during the pursuit, and had reached up to 103 miles per hour. He also opined that the fact that Cherry turned off his emergency lights and siren, but continued to follow W.T. at high speeds elevated the risk of the pursuit to the public and that Cherry violated the TPD vehicle pursuit policy.

The hearing officer issued a ninety-four-page written decision finding Cherry guilty of all charges, relying in part on the hearing officer's finding that the expert's testimony was credible. The hearing officer recommended Cherry's termination. TPD adopted the recommendation and terminated Cherry.

Cherry subsequently filed a complaint in lieu of prerogative writ in the Law Division seeking a de novo review of the hearing officer's findings and his termination.

On October 25, 2021, after a review of the record compiled by the hearing officer, the trial court issued a written opinion finding that: (1) with respect to violations of the vehicle pursuit policy, TPD had proven by a preponderance of the evidence charges 1, 2, 3, and 4; but not charge 6, and that charge 5 was duplicative of charge 4; (2) with respect to violations of the canine policy, TPD had proven by a preponderance of the evidence charges 7 through 11; and (3) with respect to violations of the truthfulness policy, TPD had proven by a preponderance of the evidence charges 12 through 14, and that charge 15 was duplicative of charge 14. As a result, the court affirmed the decision of the hearing officer as to all charges except 5, 6 and 15.

The trial court found that the testimony of the accident reconstruction expert was credible and that Cherry pursued W.T. at speeds in excess of seventy-

six miles per hour at various points in the pursuit. The trial court based its conclusion on its finding that there was "overwhelming" evidence that Cherry's patrol car "could only have reached" the locations stated in the reports "if it was travelling greatly in excess of" the thirty-five-mile-per-hour posted speed limit on the roads Cherry travelled.

The court rejected as lacking in credibility Cherry's testimony that he never exceeded the speed limit or engaged in a high-speed pursuit of W.T., as well as his claims that he was confused about the names of the streets in neighboring municipalities when he completed his reports and had inadvertently submitted draft reports, rendering those reports unreliable as evidence of the speed at which he traveled.

In addition, the trial court found that Cherry's written reports conflicted with the independent reports of other police officers who participated in the incident. For example, a Stafford Township officer who attempted to stop W.T. in that municipality at 9:56 p.m., reported that he observed both the W.T. and Cherry vehicles traveling at speeds in excess of 70 miles per hour and in a reckless manner on Route 9 and that the lights and siren on Cherry's vehicle were not activated. The Stafford officer reported that after he abandoned his attempt to stop W.T., Cherry continued to follow her at high rates of speed. The

12

trial court concluded that in his reports Cherry misrepresented the circumstances of the pursuit and the speed at which he pursued W.T. in order to justify his behavior.

In addition, the trial court concluded that despite Cherry's transmission that he was abandoning the pursuit in Little Egg Harbor, approximately 1.9 miles from the point that the pursuit began, he continued to pursue W.T. for a total of thirteen miles through five municipalities to Barnegat Township. The trial court concluded:

> Clearly, for whatever reason, Officer Cherry was not truthful in completing his report of this incident. The court finds by overwhelming evidence the pursuit of the [W.T.] vehicle was conducted at high vehicular speeds and was not consistent with the policy and guidelines imposed upon this officer relative to high[-]speed vehicular pursuits. The evidence presented to the hearing officer and reviewed by this court fully supports the conclusion that Cherry exhibited a lack of candor and truthfulness relative to the nature of this pursuit, the veracity of the reported vehicle speeds and the conflict with the reports filed by . . . Cherry. This charge is sustained by a preponderance of the evidence.

The court concluded, however, that TPD did not prove by a preponderance of the evidence that Cherry intentionally disobeyed a direct order from Sanzari to terminate the pursuit. The court found that "[t]he nature of the interchange between Cherry and Sanzari clearly did not rise to the level of a direct order."

13

The court found that its conclusion on this point was corroborated by the direct order Sanzari gave regarding the use of spike strips to stop W.T.'s vehicle.

The trial court rejected Cherry's argument that he cannot be disciplined for the pursuit because TPD did not conduct twice yearly training on the department's vehicle pursuit policy. The court found that there was no dispute that Cherry was aware that a pursuit was not authorized for a motor vehicle offense and could be instituted where an officer reasonably believes a subject is engaged in second-degree eluding that creates a risk of death or injury to any person.

The court also found that accepting Cherry's version of events, there is no support for his contention that he reasonably believed W.T. was engaged in second-degree eluding. Cherry reported that he followed W.T. at low speed once he terminated the pursuit in Little Egg Harbor. In addition, the court found, if it considered instead that W.T. was engaged in a high-speed pursuit of W.T., then Cherry's actions violated the pursuit policy because he did not terminate the pursuit to avoid the risk of harm posed by the pursuit, given that he knew W.T.'s identity and address and that she was likely heading home, where he or Barnegat officers could apprehend W.T. that night or at a later date.

14

With respect to Cherry's use of Gunner, the trial court found that the evidence, including the video recording of W.T.'s arrest, established that Cherry failed to give the warnings required by TPD's canine policy prior to releasing Gunner, although he had an opportunity to do so. In addition, the court found that Cherry released the dog when W.T. was face down on the ground and being handcuffed by the Barnegat officers. The court found that Cherry allowed Gunner to remain on W.T. for twenty-eight seconds while she was fully subdued by the Barnegat officers. The court concluded,

> based upon the evidence and testimony presented below . . . the court finds credible that the use of the dog was in conflict with the policies and procedures adopted by the department, that . . . K-9 Officer Cherry was in violation of these rules when he failed to warn the suspect [W.T.] that he would release the dog unless she submitted to the arresting officers, and that the subsequent encounter, if not the direct cause of any personal injury was the direct cause of extreme emotional distress. As to the charges based upon a violation of the K-9 policies, this court must conclude that the charge has been proven by a preponderance of the evidence.
>
> In addition, the use of the dog for an extended period after the suspect no longer resisted the officers effectuating the arrest constituted an excessive and unnecessary use of force.

As to Cherry's failure to take photographs of W.T., the court found that although Cherry testified that he was unable to take photographs, the video

15

recording depicts Cherry uttering an expletive to a Barnegat officer when he discovered that the video recorder on a Barnegat police vehicle was recording the event. The court found that Cherry was visibly upset when he was advised that the recorder had captured the entire event and inferred from that reaction that Cherry did not want the incident to be recorded.

The trial court also found that Cherry's reports of the incident were false and designed to portray his actions in a favorable light. The court concluded that Cherry falsely described both the pursuit and the circumstances in which he released Gunner at W.T.'s arrest.

The trial court rejected Cherry's argument that the TPD Chief lacked the authority to conduct the investigation. The court found that the Chief had the authority to assign the investigation to any officer, including himself. The trial court also found unconvincing Cherry's arguments that the Chief was precluded from relying on the OCPO's investigation and that his investigation had a predetermined outcome. The trial court also found no evidence of bias on the part of the OCPO and rejected Cherry's argument that the hearing officer was not impartial because her daughter was appointed as an OCPO Assistant Prosecutor after the hearing had started or because her spouse was a retired Superior Court Judge who sat in the Ocean vicinage.

16

The trial court also agreed that termination was an appropriate sanction for Cherry. The court reasoned that Cherry's violations of the pursuit policy were serious in light of the history of calamitous results to innocent members of the public as the result of high-speed police pursuits. In addition, the trial court found that despite Cherry's acquittal on criminal charges arising from the release of Gunner, there was clear evidence that he violated TPD's canine policy.

The court found that the pursuit and canine policy violations, considered alone, might warrant a lesser penalty than termination. However, the court concluded, Cherry's falsifications in his reports about the incident "can only be described as intended to obscure rather than disclose the truth." The court found that "[o]nce the truthfulness of an officer is called into question in the community, his ability to serve his . . . role in the criminal justice process is seriously compromised." The court found that Cherry's "continued service as a police officer has been substantially compromised by this conduct surrounding this incident" and the "only appropriate discipline, in order to restore and maintain public trust in the police department, is to regrettably terminate his employment and to remove him as a police officer."

An October 25, 2021 judgment memorializes the trial court's decision.

This appeal follows. Cherry argues: (1) because the evidence reveals that Cherry had a reasonable belief that W.T. was engaged in second-degree eluding, and TPD's policy allows pursuits in such circumstances, charges 1 through 4 must be dismissed; (2) the TPD pursuit policy only prohibits the pursuit of a stolen vehicle in certain circumstances, warranting dismissal of charges 1 through 4; (3) the accident reconstruction expert was not qualified to offer an opinion on whether Cherry violated the TPD pursuit and canine policies; (4) the trial court made conclusions with respect to charges 7 through 11 that are contrary to the evidence in the record; (5) charges 12 through 14 are not supported by the record because TPD produced no evidence Cherry knowingly provided false information in his reports; (6) the absence of an independent investigation by the TPD internal affairs unit and reliance on the OCPO's investigation violated Attorney General guidelines and TPD's internal policy; (7) the hearing officer precluded Cherry from challenging the adequacy of the OCPO investigation; (8) the trial court precluded Cherry from supplementing the record with evidence of bias; and (9) termination was an excessive sanction.

II.

Because the borough is a non-civil service jurisdiction, the statutory framework for disciplinary proceedings against police officers is governed by

18

N.J.S.A. 40A:14-147 to -151. <u>Ruroede v. Borough of Hasbrouck Heights</u>, 214 N.J. 338, 343 (2013). That statutory scheme requires TPD demonstrate "just cause" for any suspension, termination, fine, or reduction in rank. <u>Id.</u> at 354 (quoting N.J.S.A. 40A:14-147). Just cause includes "incapacity, misconduct, or disobedience or rules and regulations." N.J.S.A. 40A:14-147.

The Supreme Court has recognized "misconduct" under N.J.S.A. 40A:14-147 "need not be predicated on the violation of any particular department rule or regulation," but may be based merely on the "implicit standard of good behavior which devolves upon one who stands in the public eye as the upholder of that which is morally and legally correct." <u>In re Phillips</u>, 117 N.J. 567, 576 (1990) (quoting <u>In re Emmons</u>, 63 N.J. Super. 136, 140 (App. Div. 1960)). Because "honesty, integrity, and truthfulness [are] essential traits for a law enforcement officer," the Court has upheld termination where an officer acted in a manner calling those principles into question. <u>Ruroede</u>, 214 N.J. at 362; <u>see also</u> <u>State v. Gismondi</u>, 353 N.J. Super. 178, 185 (App. Div. 2002) ("[T]he qualifications required to hold [a law enforcement] position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public.").

Pursuant to N.J.S.A. 40A:14-150, a police officer convicted of any disciplinary charge may seek review in the Superior Court. Ruroede, 214 N.J. at 355. The trial court's review is de novo. Ibid. The court must conduct "an independent, neutral, and unbiased" review of the disciplinary action, making its own findings of fact and "reasonable conclusions based on a thorough review of the record." Id. at 357 (quoting Phillips, 117 N.J. at 580). "Although a court conducting a de novo review must give due deference to the conclusions drawn by the original tribunal regarding credibility, those initial findings are not controlling." Ibid. (quoting Phillips, 117 N.J. at 579).

We exercise a "limited" role in our review of the de novo proceeding. Phillips, 117 N.J. at 579. "[W]e must ensure there is 'a residuum of legal and competent evidence in the record to support'" the court's decision. Ruroede, 214 N.J. at 359 (quoting Weston v. State, 60 N.J. 36, 51 (1972)). "The residuum rule does not require that each fact be based on a residuum of legal and competent evidence but rather focuses on the ultimate finding or findings of material fact." Ibid. We do not make new factual findings, but merely "decide whether there was adequate evidence before the . . . [c]ourt to justify its finding of guilt." Phillips, 117 N.J. at 579 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

The court's de novo findings should not be disturbed, absent a finding that "the decision below was 'arbitrary, capricious or unreasonable' or '[un]supported by substantial credible evidence in the record as a whole.'" Ibid. (quoting Henry v. Rahway State Prison, 81 N.J. 571, 580 (1963)). However, we review the trial court's legal conclusions de novo. Cosme v. Borough of E. Newark Twp. Comm., 304 N.J. Super. 191, 203 (App. Div. 1997) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

We have carefully reviewed the record in light of these principles and conclude that there is substantial credible evidence in the record supporting the trial court's determination that TPD established that Cherry committed charges 1, 4 and 7 through 14. We conclude, however, that there is insufficient evidence in the record to support the trial court's conclusion that TPD established Cherry committed charges 2 and 3.

We begin with the two charges we find are not supported by the record. Charges 2 and 3 are based on Section VI of the TPD vehicle pursuit policy. Section VI of the policy provides, in relevant part:

> A.    Tuckerton police officers in a police vehicle may initiate a pursuit when the following criteria are met:
>
> . . . .

2. When the officer reasonably believes that the violator has committed one of the second[-]degree offenses listed below:

. . . .

f) Eluding pursuant to the provisions of 2C:29-2b where the flight or attempt to elude creates a risk of death or injury in any person . . . .

. . . .

3. Pursuits for stolen vehicles shall be restricted. Officers shall immediately terminate the pursuit when;

a) The identity of the violator is known

b) The violator's operation of the stolen vehicle is such that the violator is substantially increasing the likelihood of collision with another vehicle or pedestrian

c) It is evident that the violator will not stop

d) The pursuit enters into another jurisdiction and exceeds one mile into the neighboring jurisdiction.

e) The pursuing officer is the only officer on duty, the officer shall not exceed outside the boarders [sic] of the borough.

4. When the pursuit is for the sole offense of a stolen vehicle and where the violator may flee onto a dead[-]end or cul-de-sac area, officers will not pursue the violator down the roadway. Officers shall consider the violator is attempting to escape, and where permitted to do so on foot there are other resources and options available (I.E. Canines, Perimeters, Area

22

Searches). Where the majority of dead[-]end streets and cul-de-sac areas within the borough are surrounded by water and/or wooded areas, the violator shall be afforded an opportunity to abandon the vehicle. Therefore officers shall;

a) When an officer makes an attempt to stop a violator for a motor vehicle violation utilizing the emergency lighting and audible warning device of the patrol car and where the violator willfully ignores the signals accelerating as to elude the attempt to stop, officer will immediately disengage the attempt. No officer shall make additional attempts to stop or reengage the vehicle while in motion, based on the original reason for the attempt to stop. Officers shall conduct an investigation as to pursue criminal and motor vehicle charges against the violator.

Charge 2 was based on Section VI.A.4.a. The specification for the charge states that after W.T. willfully ignored Cherry's attempt to stop her with his emergency lights and siren, he failed to stop the pursuit. The plain language of Section VI.A.4.a, however, applies only where the pursuit is for the sole offense of a stolen vehicle. There is no evidence in the record that W.T. stole the vehicle she was driving during the pursuit. Thus, the directive in VI.A.4.a, which appears to be intended to give suspects an opportunity to abandon stolen vehicles in order to reduce the risk to public safety from a vehicle pursuit, does not apply to the events of January 29, 2014.

Charge 3 was based on Section VI.A.3.d. The plain language of that provision also applies only to the pursuit of stolen vehicles. It is, therefore, not applicable to the January 29, 2014 incident.

We find sufficient credible evidence in the record for the trial court's conclusion that TPD established charges 1 and 4 arising from Cherry's violation of the TPD vehicle pursuit policy. Those charges are based on Cherry's failure to terminate the pursuit, based on the risk it posed to W.T., himself, and innocent members of the public. Even if Cherry believed W.T. was engaged in second-degree eluding, a supposition contradicted by Cherry's reports which stated that he was following W.T. at a safe distance at thirty-five miles per hour, the credible evidence established that Cherry was engaged in a high-speed pursuit, exceeding seventy-six miles per hour, at times with no emergency lights and siren, for thirteen miles through five municipalities. Yet, it is undisputed that he knew the identity of the driver and where she lived and suspected that she was heading home.

The only dangerous activity in which W.T. engaged during the pursuit was as a result of the pursuit. Presumably, had Cherry ended the pursuit, W.T. would have had no incentive to drive recklessly for the remainder of her trip home to Barnegat, where Cherry or a Barnegat officer could have served her with a

summons for eluding or motor vehicle violations without further endangering the public. As the trial court aptly found, the fact that Cherry misrepresented the circumstances of the pursuit, making it appear that it posed less of a threat to the public than is actually did, corroborates the conclusion that Cherry engaged in a high-speed pursuit he knew was not justified. Cherry violated the vehicle pursuit policy provisions applicable to all pursuits that require an officer to terminate a pursuit when the danger to the public outweighs the need to immediately apprehend the offender.

We find sufficient support in the record for the trial court's decision affirming charges 7 through 11 relating to the TPD canine policy. The record demonstrates that Cherry used more force than necessary to subdue W.T., who was face down on the ground with her hands visible and being arrested by Barnegat officers when he released Gunner. The Barnegat officers, whom the trial court found looked surprised when the dog subdued W.T., did not ask Cherry to release Gunner. In addition, the video recording demonstrates that Cherry had an opportunity to warn W.T. that he was going to release Gunner and to stop resisting, but failed to do so. In addition, there is sufficient evidence in the record to support the trial court's conclusion that Cherry failed to call Gunner off W.T. for a longer period than necessary, given that W.T. was no

25

longer resisting arrest by the Barnegat officers.  We reach the same conclusion with respect to the trial court's finding that Cherry failed to take photographs of W.T. because he did not want to document the event.

The record also supports the trial court's findings regarding charges 12 through 14.  The trial court found that Cherry made material misrepresentations in his reports concerning his termination of the pursuit, the speed at which he pursued W.T. and the need to release Gunner at W.T.'s arrest.  Each of those findings is based on substantial credible evidence in the record.

We have carefully considered Cherry's remaining arguments concerning the investigation, independent hearing officer, trial court proceedings, and evidentiary support for the sustained charges, and conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

We also affirm the sanction imposed on Cherry.  Progressive discipline "generally requires a progression of steps to address the employee's deficiencies before removal."  Klusaritz v. Cape May Cnty., 387 N.J. Super. 305, 312 (App. Div. 2006).  While an officer's past record cannot prove a current charge based on habitual misconduct, it may present "guidance in determining the appropriate penalty for the current specific offense."  In re Carter, 191 N.J. 474, 484 (2007) (quoting Town of W. New York v. Bock, 38 N.J. 500, 522-23 (1962)).

Progressive discipline is not necessary, however, "when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." In re Stallworth, 208 N.J. 182, 197 (2011) (quoting In re Herrmann, 192 N.J. 19, 33 (2007)).

To determine whether a disciplinary action is appropriate, we assess whether the "punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Herrmann, 192 N.J. at 28-29 (quoting In re Polk, 90 N.J. 550, 578 (1982)). Our Supreme Court has warned "courts should take care not to substitute their own views of whether a particular penalty is correct for those of the body charged with making that decision." Carter, 191 N.J. at 486.

Courts routinely eschew progressive discipline and terminate police officers for severe misconduct. See, e.g., Ruroede, 214 N.J. at 362-63 (positing termination appropriate for police officer who displayed a weapon during an off-duty altercation and made dishonest and "inconsistent statements during the course of the internal affairs investigation"); McElwee v. Borough of Fieldsboro, 400 N.J. Super. 388, 397 (App. Div. 2008) (finding progressive discipline "need not be imposed" for officer's continued refusal to patrol as

A-0913-21

instructed); <u>Cosme</u>, 304 N.J. Super. at 207 (holding termination warranted for officer who took unauthorized vacation). Further, actions "that subvert good order and discipline in a police department 'constitute conduct so unbecoming a police officer as to warrant dismissal.'" <u>Herrmann</u>, 192 N.J. 35 (quoting <u>Cosme</u>, 304 N.J. Super. at 205-06).

In considering whether the imposed penalty is appropriate, we note police officers are "constantly called upon to exercise tact, restraint and good judgment in [their] relationship with the public" and "must present an image of personal integrity and dependability in order to have the respect of the public." <u>Twp. of Moorestown v. Armstrong</u>, 89 N.J. Super. 560, 566 (App. Div. 1965). Police officers are held to a higher standard as "one of the obligations [they undertake] upon voluntary entry into the police service." <u>Phillips</u>, 117 N.J. at 577 (quoting <u>Emmons</u>, 63 N.J. Super. at 142).

Despite the fact that we reverse the trial court with respect to two of the disciplinary charges, we find sufficient support in the record for the sanction imposed. The record supports the trial court's conclusion that Cherry engaged in a high-speed pursuit for thirteen miles through five municipalities that he should have terminated because of the threat it posed to public safety. In addition, at the conclusion of the pursuit, Cherry released a canine on a suspect

28

that was face down on the ground with visible hands and being arrested by two officers. The seriousness of Cherry's infractions were magnified by his failure to properly document the use of the dog and the numerous misrepresentations he made in his reports of the incident intended to obscure the true circumstances of the pursuit, which Cherry likely knew was not justified. Even though two of the charges related to the pursuit have been reversed, the charges relating to his dishonesty have not. The record contains sufficient evidence establishing that Cherry's position of trust as a police officer has been irreparably harmed by his dishonesty, warranting his termination.

The October 25, 2021 judgment is affirmed in all respects, apart from the trial court's decisions to uphold charges 2 and 3, which are reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

29

A-0913-21